[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 1, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-14960
Non-Argument Calendar

_____

D.C. Docket No. 03-20470-CV-FAM

JOANNE MCSHANE,

Plaintiff-Appellant,

versus

U.S. ATTORNEY GENERAL,
Alberto Gonzales as Attorney General,
DAVID TROYER,
individually,

Defendants-Appellees,

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(August 1, 2005)**

Before BIRCH, BARKETT and FAY, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Joanne McShane appeals, through counsel, the district court's grant of summary judgment in favor of her former employer, the Attorney General of the United States of America ("the defendant"), on her Title VII retaliation claims, filed pursuant to 42 U.S.C. § 2000e-3. McShane argues that the court erred in concluding that no genuine issue of material fact existed on whether McShane established a prima facie case of Title VII retaliation, and, if she did, whether the defendant's legitimate, non-discriminatory reason for its allegedly retaliatory conduct was pretextual. For the reasons set forth more fully below, we affirm the district court's grant of summary judgment.

McShane, a former female employee of the defendant, filed a counseled amended complaint against the defendant, alleging the following facts. McShane, who was an attorney licensed to practice in the State of Florida, began her employment with the defendant on October 19, 1998, as a "Paralegal Specialist" with the High Intensity Drug Trafficking Area Program ("HIDTA"),[1] in Miami, Florida. Although McShane was paid through a temporary agency until she passed her background check, she later was paid as an employee of the Monroe

[1] A HIDTA is a designation assigned by the Office of National Drug Control Policy, which provides resources and funding to enhance law enforcement efforts in areas where major drug production, manufacturing, importation, or distribution exists. The HIDTA task force at issue here was staffed by employees of various local, state, and federal agencies, and was located physically within the U.S. Attorney's Office.

County Sheriff's Office.  Regardless of this employment relationship, (1) David Troyer, an Assistant U.S. Attorney and the Deputy Chief of this HIDTA task force, interviewed her and recommended that Doug Hughes, the Director of the HIDTA task force, hire her; (2) the U.S. Attorney's Office conducted McShane's training; and (3) Troyer served as her immediate supervisor.

McShane further alleged that Troyer (1) hired a non-litigating male attorney to perform essentially the same work as McShane, but at a higher salary; (2) became hostile when McShane requested to have her title changed to "post conviction attorney"; (3) deleted e-mail from her without reading it; and (4) failed to respond to harassing conduct she received from agents in the Drug Enforcement Administration ("DEA").  McShane also claimed that the defendant (1) made false accusations about her psychological state; (2) denied her training manuals; (3) pre-printed her telephone extension on Federal Express package slips, resulting in a call to her each time a package arrived; and (4) talked to McShane's coworkers about her alleged personal problems.

In response to this conduct, McShane (1) complained to Hughes, Troyer, and Kathleen Amstutz, McShane's supervisor within the Monroe County Sheriff's Office, during a meeting on February 11, 1999; and (2) filed an internal complaint of gender discrimination and retaliation with the Equal Employment Opportunities

3

Office of the U.S. Attorney's Office.  Troyer, thereafter, used his position to "get [her] fired."  Based on these allegations, McShane asserted that the defendant retaliated against her (1) for making "internal complaints" opposing gender discrimination by Troyer, in violation of the "opposition clause" ("Count 2");[2] and (2) for participating in prior Title VII litigation, in violation of the "participation clause" ("Count 3").[3]

After answering this complaint, the defendant filed a motion for summary judgment, with an incorporated statement of facts and a memorandum of law.  The defendant argued, in relevant part, that McShane could not establish a prima facie case of Title VII retaliation because she could not show, under Title VII's opposition clause, that she had "a good faith, reasonable belief that [the defendant had] engaged in unlawful employment practices."  The defendant further

---

[2] Title VII's retaliation provisions protect certain kinds of activity.  See Equal Employment Opportunity Comm'n v. Total System Services, Inc., 221 F.3d 1171, 1174 (11th Cir. 2000).  Under its opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter."  See 42 U.S.C. § 2000e-3(a).  On the other hand, under its participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  See id.

[3] McShane also included in her amended complaint a claim of gender discrimination, in violation of 42 U.S.C. § 2000e-16 ("Count 1").  The district court, however, granted summary judgment on this count because McShane conceded that "discovery [had] failed to produce evidence sufficient to support" this claim.  Because McShane has not challenged this determination on appeal, we deem arguments on it abandoned, see Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (issues not argued in initial brief are deemed abandoned).

contended that, even if McShane had made such a showing, she had failed to show that her protected activity was causally related to an adverse employment action because (1) the persons involved in the decision to terminate her employment all testified that this decision was based on McShane's inability to get along with her coworkers, and (2) the ultimate decision-maker considered, but did not rely on, information supplied by Troyer. Finally, the defendant argued that McShane could not show that its reason for the termination, that is, that she could not get along with others, was pretextual.

In support of this motion, the defendant submitted Troyer's deposition, in which he testified that McShane's primary job duties involved researching and writing draft responses to post-conviction petitions. In November 1998, McShane complained to Troyer about her lack of secretarial help, expressed concerns about security matters, and stated that she had discovered one of the secretaries working on McShane's computer.[4] In early January 1999, McShane also told Troyer that (1) someone had stolen a pen from her office, and (2) Wanda Hubbard, McShane's secretary, had used McShane's office without permission.[5]

---

[4] Amstutz also testified that, approximately one month after McShane began her employment with the defendant, McShane (1) appeared less friendly; (2) was disturbed by, and asked questions about, the background process; (3) made phone calls to the defendant's personnel office; and (4) objected to signing standard forms.

[5] Amstutz testified that, after this complaint, and on McShane's request, a lock was installed on McShane's office door.

5

Troyer further testified that, on February 9, 1999, McShane told him that (1) her relationships with the secretarial support staff had deteriorated; (2) she was concerned about secretaries and DEA agents having access to attorneys' offices; and (3) she was considering filing a complaint about her concerns, without specifying the nature of this complaint. After Troyer advised Hughes of this discussion and suggested scheduling a meeting, Hughes instructed Troyer to document in a memorandum his encounters with McShane. On February 10, 1999, Troyer prepared a memorandum, documenting his conversations with McShane on February 9 and 10, 1999, and noting his observations of her behavior.[6] Troyer also clarified that he expressed these observations to protect the safety and well-being of the people working in the office, including McShane.

Jean Cockshutt, the fiscal officer for the HIDTA office and Amstutz's supervisor, also testified as part of a deposition, stating that, on December 16, 1998, McShane complained to her that McShane had not been invited personally to the HIDTA Christmas party, and that her coworkers were treating her differently. Cockshutt responded that, instead of giving out personal invitations to

_____

[6] These observations included that McShane (1) had become "virtually reclusive" and had engaged in "recent bizarre behaviors" that were unexplainable; (2) "might be mentally unstable, as she seem[ed] paranoid and [did] not appear to be dealing with reality"; (3) "[might] be a danger to herself and others, particularly those whom she views as enemies."

the Christmas party, the office posted an invitation on the door.[7]

Hughes declared that, on February 11, 1999, he conducted a meeting with McShane, Amstutz, Cockshutt, and Troyer, (1) to give McShane the opportunity to express her concerns, and (2) to determine if appropriate actions were necessary and could be taken. During this meeting, McShane expressed her concern that coworkers were conspiring against her. McShane, however, neither complained that she was being discriminated against, nor indicated that she intended to file a discrimination complaint.[8] Hughes and Cockshutt were left with the impression that McShane's perception of reality was distorted, and that there was no way to resolve her concerns. Moreover, after this meeting, McShane continued having problems with her supervisors and coworkers.[9]

Hughes further declared that, at some point, he, Amstutz, and Cockshutt came to the agreement that McShane's employment with the defendant should be terminated prior to the completion of her probationary period. After Hughes

---

[7] McShane also complained to Amstutz and Troyer about not being invited personally to the office Christmas party.

[8] Although McShane did not complain of discrimination, she vaguely stated during this meeting that she believed that Troyer had "a problem dealing with women," and that Troyer and the secretarial staff did not like her because an HIDTA agent had been a defendant in a Title VII case in which McShane had represented the plaintiff.

[9] These problems included McShane initially refusing to sign a standard appointment form for all employees of the Sheriff's Office at HIDTA, and making a written complaint to Amstutz about McShane's secretary, Wanda Hubbard, which Amstutz determined to be unjustified.

consulted with Mark Willis, counsel for the Sheriff's Office, who concurred with this decision, Hughes obtained the authorization and approval of the Monroe County Sheriff for this employment action.[10]  In making this employment decision, Hughes (1) acted because of the detrimental effect on the workplace environment of McShane's inability to get along with her coworkers; (2) did not receive any recommendations regarding McShane's termination; and (3) considered Troyer's input, but made his decision to terminate McShane's employment based on the totality of the circumstances, including the independent observations of Hughes, Cockshutt, and Amstutz.

The defendant also included documentation showing that, (1) on or about February 25 or 26, 1999, McShane contacted Charlotte Zamora Griffith, the defendant's Equal Employment Opportunity contact person, and asked Griffith how she could file a discrimination complaint.  On August 8, 1999, McShane filed a formal E.E.O.C. complaint of discrimination against the defendant.  On January 8, 2003, following an investigation, the Department of Justice issued a final agency decision, determining that the defendant should be treated as McShane's employer, but that the evidence did not support McShane's discrimination claims.

McShane responded to this motion for summary judgment by arguing, in

---

[10]  On March 3, 1999, the Sheriff's Office issued a notice of withdrawal of McShane's employment.

relevant part, that she engaged in protected activity under the "participation clause" of Title VII by being a party in a Title VII lawsuit in Brevard County, helping a client file an E.E.O.C. charge, and by initiating an E.E.O.C. complaint a few days before she was fired from HIDTA. She asserted, as such, that her good faith, or lack thereof, was not relevant. In support of McShane's argument that her internal discrimination complaints were based on a reasonable, good faith belief that she had suffered discrimination, she cited to the facts that (1) when she confronted Troyer about her dissatisfaction about her title of "Paralegal Specialist," Troyer mocked her by making the Sign of the Cross and "ordaining" her an attorney; (2) she was not assigned enough work; (3) she received no support from Troyer on office systems or with secretarial support; (4) Troyer made demeaning comments about women paralegals in general;[11] (5) Troyer, Hughes, and her administrative supervisors knew about her prior Title VII litigation; and (6) she received a strange phone call from a law enforcement agent who had been the defendant in the prior Title VII case.

McShane also argued that the defendant subjected her to an adverse employment action that was causally related to her protected activity because, although the Monroe County Sheriff actually terminated her employment, under

---

[11] These comments allegedly included that "those paralegal specialists, those women, don't respond well to light. They are just glorified secretaries and they are basically useless."

the "cats paw" theory of liability, he was manipulated by Troyer's improper February 10, 1999, memorandum. McShane asserted, as well, that a causal connection was established by the close temporal relationship between February 24, 1999, when she contacted Zamora Griffith about initiating a charge, and March 4, 1999, when her employment was terminated.[12]

Furthermore, McShane argued that she established that the defendant's proffered nondiscriminatory reason for terminating her employment was pretextual because the defendant presented inconsistent testimony on whether (1) Troyer knew that McShane intended to file a complaint targeting his behavior; (2) Troyer gave Zamora Griffith the February 10, 1999, memorandum; (3) there were problems with McShane's work product; (4) Troyer did not assign McShane more cases because there was a "drought" of work; and (5) other employees complained about McShane. McShane also cited as evidence (1) deposition testimony from Ed Ryan and Charles White, two Assistant U.S. Attorneys, that they did not observe McShane behave as described in the February 10, 1999, memorandum; and (2) documentation showing that her employment was terminated shortly after

---

[12] McShane also filed in support a declaration by her husband, Michael McShane, that, on February 26, 1999, she told Hughes that his wife had filed a "formal complaint"; and Zamora Griffith's testimony that she, or another employee, told Troyer, around the time period of February 25, 1999, about McShane's E.E.O.C. complaint and asked Troyer to fax her a copy of the February 10, 1999, memorandum.

she initiated an E.E.O.C. complaint.

The defendant replied that McShane had failed to explain why her conduct before February 25 or 26, 1999, constituted Title VII protected activity because the behavior of which she complained neither was discriminatory, nor sufficiently severe or pervasive as to constitute legal harassment. The defendant further contended that, by February 1999, the defendant had expressed serious concerns about McShane's ability to get along with others. In addition, the defendant asserted that it had offered a legitimate, non-discriminatory reason for McShane's termination, and that McShane had not shown that this reason was pretextual. On the issue of pretext, the defendant specifically explained that the alleged inconsistencies either were immaterial to the reason for her termination, or were insufficient to show that the reason was untrue. Finally, the defendant contended that McShane had failed to present evidence to dispute that she was having difficulties getting along with her HIDTA coworkers.

The district court granted the defendant summary judgment on all of McShane's claims in her amended complaint. The court initially explained that it was assuming, without deciding, that McShane was an employee of both Monroe County and the defendant. The court generally concluded that McShane's complaints, about such matters as her job title, which the court noted had been

changed officially to "post-conviction attorney," and the office Christmas party, "rather than forming the basis of a claim for sex discrimination or even retaliation, instead [gave] credence to the employer's reason for her discharge, i.e. her inability to get along with others." The court also explained that the termination of McShane's employment "obviously" was an adverse employment action.

The court then discussed that, to the extent McShane had alleged that she had engaged in Title VII protected conduct under the "participation clause" by participating in prior Title VII litigation against a former employer and by representing a female employee of the City of Miami Beach Police Department, the prior litigation was too remote and unrelated to constitute protected activities relating to the instant retaliation claim.[13] The court determined that, to the extent McShane had alleged that she had engaged in protected conduct under the "opposition clause" by making informal complaints of discrimination and by initiating contact with Zamora Griffith after filing a Title VII action, McShane had failed to show that she had a "good faith reasonable belief" that the defendant had engaged in unlawful discrimination. On this last point, the court explained that (1) McShane's complaints about the workplace were not related to unlawful

---

[13] Although the parties agreed in their "joint pretrial stipulation" that McShane engaged in protected activity when she made inquiries on or about February 25 or 26, 1999, as to how she could file a discrimination complaint, they did not agree that this activity was protected under Title VII's participation clause.

12

discrimination, (2) although Troyer allegedly made derogatory comments about female paralegals, these comments were not directed at McShane, and (3) Hughes was the person who ultimately decided to terminate McShane's employment.

The court also determined that, even if McShane had established a prima facie case of retaliation, she had failed to show that the defendant's legitimate, non-discriminatory reason for terminating her employment was pretextual. The court acknowledged that McShane had identified some inconsistencies in the defendant's testimony, but it concluded that these inconsistencies either were unrelated to her Title VII claim and the defendant's proffered reason for the termination of her employment, or did not establish pretext because Troyer was not the decision-maker. The court found that Troyer's observations in his February 10, 1999, memorandum about McShane's mental state were corroborated by the observations of other HIDTA employees, including Amstutz and Cockshutt. Finally, the court noted that, although Hughes, in deciding to terminate McShane's employment, considered the contents of Troyer's February 10, 1999, memorandum, Hughes independently conducted an investigation and considered the input of several employees before making his decision.

McShane specifically argues on appeal that the court implicitly failed to view all of the facts in the light most favorable to her when it concluded that her

complaints were more indicative of her difficulties with getting along with others, instead of evidence of discrimination. McShane also asserts that the court erred in concluding that her initiating an E.E.O.C. complaint was activity protected under Title VII's "opposition clause," and, thus, required a showing that she had a "good-faith, reasonable belief" that the conduct complained of constituted gender discrimination. McShane contends that the court, instead, should have construed this conduct as protected activity under the "participation clause."[14]

In addition, McShane argues that she established that the termination of her employment was causally related to her protected activity because the termination occurred only three business days after she initiated the filing of an E.E.O.C. charge. She asserts that Troyer caused the termination of her employment by using Hughes and the Monroe County Sheriff as "cat's paws." Alternatively, McShane contends that the hybrid structure of the HIDTA office resulted in Troyer having de facto control over her employment. Finally, McShane asserts

---

[14] In raising this appeal, McShane explains that she is not appealing the court's determination that her prior participation in Title VII actions was too remote to be relevant in this action. McShane also has not raised arguments challenging the court's determination that her protected activity under the opposition clause was not based on a "good faith, reasonable belief" that she was the victim of discrimination. See Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1187 (11th Cir. 2001) (a plaintiff asserting a claim under the opposition clause must show that a "good faith, reasonable belief" that she was the victim of discrimination lead her to engage in the protected activity). Finally, McShane concedes that she failed to assert that her initiating a complaint with Zamora constituted protected activity under Title VII's "participation clause" until she filed her opposition to summary judgment.

14

that Troyer had "ample motive" to include false statements about McShane in his February 10, 1999, memorandum, because he knew that McShane was intending to file a Title VII complaint that focused on his illegal behavior.

Finally, McShane argues that the court erred in concluding that she failed to show that the defendant's legitimate, non-discriminatory reason for terminating her employment was pretextual. McShane contends that she established pretext by showing that, although she did not get along with her coworkers beginning on October 19, 1998, her first day of employment, her employment was not terminated until March 3, 1999, shortly after she initiated her E.E.O.C. charge.

A court's order granting summary judgment is reviewed de novo, "view[ing] all evidence and all factual inferences therefrom in the light most favorable to the non-moving party." Miller v. King, 384 F.3d 1248, 1258-59 (11th Cir. 2004). "Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact and not a court deciding summary judgment." Id. at 1259 (quotation omitted). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quotation omitted). To survive a motion for

15

summary judgment, the nonmoving party must proffer evidence beyond what is asserted in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.E.2d 265 (1986) (citing Fed.R.Civ.P. 56(e)). Where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact exists. Id. at 322-23, 106 S.Ct. at 2552.

As discussed above, McShane has raised a preliminary challenge to the district court's review of the defendant's motion for summary judgment. In granting this motion, however, the court accepted McShane's alleged facts as true and determined that (1) McShane's prior suits were too remote and unrelated to her employment to constitute protected activities relating to the instant retaliation claim, and (2) McShane had failed to show that she had a good faith, reasonable belief that the defendant had engaged in the unlawful discrimination that formed the basis of her protected activity under the opposition clause. Moreover, in determining that McShane failed to show pretext, the court accepted as true her alleged facts, but found that they did not show that the defendant's legitimate, non-discriminatory reason for the termination of McShane's employment was untrue. Thus, instead of showing that the court made improper credibility determinations and findings of fact, the record reflects that the court properly

16

concluded that McShane had failed to show that a genuine issue of material fact existed. See Miller, 384 F.3d at 1259.[15] The court, therefore, did not apply the wrong standard of review.

To the extent McShane also is challenging the court's legal conclusions, it is unlawful under Title VII for an employer to retaliate against an employee "because [the employee] has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII]." 42 U.S.C. § 2000e-3(a). Where direct evidence of retaliation is unavailable—as here—a plaintiff, nevertheless, may present circumstantial evidence of discrimination sufficient to create a jury question. See Sullivan v. National Railroad Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).

For claims based on circumstantial evidence, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001). If the plaintiff is successful, the defendant must "articulate some legitimate, nondiscriminatory

_____

[15] Although McShane cites in support of this argument to the court's preliminary statement that her complaints," rather than forming the basis of a claim for sex discrimination or even retaliation, instead [gave] credence to the employer's reason for her discharge, i.e. her inability to get along with others," the court explained in greater detail later in its opinion why, even accepting these complaints as true, they did not support McShane's retaliation claims.

reason for the [adverse employment action]." Id. The plaintiff then may attempt to demonstrate that the proffered reason was, in fact, merely pretext for the defendant's acts. Id.[16] "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant's articulated reasons is pretextual, the [defendant] is entitled to summary judgment." Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc) (discussing pretext in context of discrimination involving age and disability).

To successfully assert a prima facie case of Title VII retaliation, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004). The defendant has not contested, under the second element of this prima facie case, whether McShane suffered an adverse employment action.[17]

---

[16] The Supreme Court set out this three-part burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

[17] To be considered an adverse employment action under Title VII's anti-retaliation provision, the action "must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'" See Stavropoulos v. Firestone, 361 F.3d 610, 616-17 (11th Cir. 2004) (citation omitted), cert. denied, No. 04-1099 (U.S. April 18, 2005). Ultimate

18

Instead, the defendant is arguing that McShane failed to show that (1) she engaged in statutorily protected expression, and (2) the adverse employment action was caused by this expression.

Moreover, as discussed above, McShane only is arguing on appeal that the court erred in treating her conduct in initiating an E.E.O.C. complaint as activity under the opposition clause and, therefore, requiring a showing of a "good-faith, reasonable belief" that the conduct complained of constituted gender discrimination. The Supreme Court in Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), mandated a liberal pleading standard for civil complaints. Id., 534 U.S. at 510-11, 122 S.Ct. at 997. "This standard[,] however[,] does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). We explained in Gilmour as follows:

> Efficiency and judicial economy require that the liberal pleading standard under Swierkiewicz and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.

Id. at 1315. Although issues not raised in the pleadings may be treated as if they

_____

employment decisions include decisions such as termination, failure to hire, or demotion. See id. at 617.

were properly raised when they either are "tried by express or implied consent of the parties," or "are included in a pretrial order," these exceptions are not applicable if an opposing party objects to the assertion of such a claim without the filing of a supplemental pleading. Steger v. General Elec. Co., 318 F.3d 1066, 1077 & n.11 (11th Cir. 2003) (citing to Fed.R.Civ.P. 15(b)).

In the instant case, outside of stating that she raised "internal complaints," McShane did not assert in her amended complaint that she engaged in protected activity under Title VII's participation clause by initiating an E.E.O.C. complaint with the defendant's human resource personnel. McShane also has not contended that she sought leave to amend her amended complaint. Moreover, as discussed above, although the parties agreed in their "joint pretrial stipulation" that McShane engaged in protected activity when she made inquiries on or about February 25 or 26, 1999, as to how she could file a discrimination complaint, they did not agree that this activity was protected under Title VII's participation clause. See Steger, 318 F.3d at 1077 & n.11. Thus, the district court did not err in failing to consider this claim before granting summary judgment. See Gilmour, 382 F.3d at 1314.

Even if we were to construe McShane's amended complaint as raising this claim under Title VII's participation clause, no genuine issue of material fact existed on whether McShane established a prima facie case. Title VII's

20

participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the [E.E.O.C.]; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the [E.E.O.C.]." Equal Employment Opportunity Comm'n, 221 F.3d at 1174. Thus, "at a minimum, some employee must file a charge with the [E.E.O.C.] (or its designated representative) or otherwise instigate proceedings under the statute for the conduct to come under the participation clause." Id. at 1174 n.2.

In Equal Employment Opportunity Comm'n, we examined whether a plaintiff's taking part in her employer's internal investigation of allegations of sexual harassment constituted protected activity under Title VII's participation clause. Id. at 1174. We concluded that, because no E.E.O.C. complaint had been filed before the termination of the plaintiff's employment, the plaintiff's participation in the internal investigation did not constitute protected expression under the participation clause. Id. In reaching this conclusion, we explained:

> We do not believe Congress intended to protect absolutely every [Title VII] complaint made to any employer—no matter how informal or knowingly false—as a protected activity under the participation clause. The statute's opposition clause would be rendered largely meaningless, having been engulfed by the participation clause.

Id. at 1174 n.3. We also discussed that the case was materially different from our

21

decision in Clover v. Total System Servs., 176 F.3d 1346, 1353 (11th Cir. 1999), wherein we concluded that an employee's participation in an employer's internal investigation was protected under the participation clause because the employer conducted an investigation in response to receiving a notice of charge of discrimination from the E.E.O.C. Equal Employment Opportunity Comm'n, 221 F.3d at 1174 n.3.

On February 25 or 26, 1999, McShane contacted Zamora Griffith and asked her about the mechanics of filing a discrimination complaint. However, McShane did not file a formal E.E.O.C. complaint of discrimination against the defendant until August 8, 1999. Although McShane characterizes Zamora Griffith as a "contact person" with the E.E.O.C., Zamora Griffith, instead, was a human resources employee in the defendant's administrative division. McShane also has cited to our decision in Eastland v. Tennessee Valley Auth., 704 F.2d 613 (11th Cir. 1983), in which we noted that "[e]vidence that the adverse treatment followed closely upon the protected activity (i.e. contacting an [E.E.O.C.] officer) may be sufficient to establish a causal connection." See id. at 627. Unlike the facts here, however, Eastland involved a plaintiff who consulted an E.E.O.C. counselor, who, in turn, recommended that the employer conduct a service review of the plaintiff's performance. See id. Thus, McShane failed to show that this conduct was

22

protected under Title VII's participation clause and she, therefore, had to show a good-faith, reasonable belief that she suffered discrimination.  See  Equal Employment Opportunity Comm'n, 221 F.3d at 1174.

Furthermore, even if we were to determine that McShane engaged in protected activity under the participation clause, McShane failed to show that this activity was causally related to the termination of her employment.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that protected activity and the adverse actions were not wholly unrelated."  Shannon v. BellSouth Telecommunications, Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quotation omitted).  "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated."  Id. at 716-17 (quotation omitted).  Nevertheless, "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge."  Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002).  Moreover, "mere coincidence in time [may not] raise an inference of actual knowledge 'where there is unrebutted evidence that the decision[-]maker did not have knowledge that the employee engaged in protected conduct.'"  Id. (internal quotation omitted).

As discussed above, McShane contends that the relevant decision-makers

knew about her contacting Zamora for information about filing a E.E.O.C. complaint before it terminated her employment. In support, McShane asserts that (1) Michael McShane declared that he told Hughes on February 26, 1999, that Joanne McShane had filed a "formal complaint"; and (2) Zamora Griffith stated that either she, or another employee, told Troyer about McShane's E.E.O.C. complaint and asked Troyer to fax her a copy of the February 10, 1999, memorandum. Indeed, the period between McShane's initiation of her complaint on February 25 or 26, and the termination of employment on March 3, was a "close temporal" proximity that ordinarily would be sufficient to show that the two "were not wholly related." See Shannon, 292 F.3d at 716; see also Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2001) (noting that we had determined that a period of as much as one month between the protected expression and the adverse action is not too protracted).

However, Hughes testified that he, not Troyer, made the recommendation that the Monroe County Sheriff terminate McShane's employment. See Bass v. Bd. of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1119 (11th Cir. 2001) ("It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression"). Hughes stated

24

that he did not know of McShane making a complaint about discrimination based on her gender. Moreover, although Michael McShane told Hughes that his wife filed a "formal complaint," Michael McShane did not specify with whom she filed the complaint, or the contents of the complaint. McShane, therefore, failed to establish a causal connection by showing that the ultimate decision-maker knew of her protected activity when he made the decision. See Brochu, 304 F.3d at 1156.

Finally, to the extent McShane is challenging whether Hughes was a "cat's paw" for Troyer, and that Troyer had a motive to retaliate, McShane has cited to evidence showing that (1) Troyer initially interviewed her and supervised her daily work; and (2) the Monroe County Sheriff testified that he signed off on the termination after reading Troyer's February 10, 1999, memorandum, which suggested that she was mentally unstable. We, however, have determined that, although causation may be established, even when the person with the unlawful animus is not the decision-maker, the actual decision-maker must have acted in accordance with this person's decision, without the actual decision-maker himself evaluating the employee's situation. Llampallas v. Mini-Circuits, Lab., Inc., 163 F.3d 1236, 1249 (11th Cir. 1998). In a "cat's paw" situation, the person with the unlawful animus "clearly causes the tangible employment action, regardless of which individual signs the employee's walking papers." Id.

25

Here, Hughes declared that, although he considered McShane's input, Hughes made the employment decision based on the totality of the circumstances, including the independent observations of Hughes, Cockshutt, and Amstutz. In addition, McShane has not produced evidence contradicting this assertion. Thus, regardless of who was supervising and evaluating her work, McShane has failed to establish that Hughes was merely a "cat's paw" for Troyer. See Llampallas, 163 F.3d at 1249.

Even if we were to conclude that McShane established a prima facie case of Title VII discrimination, she failed to show that the defendant's legitimate, non-discriminatory reason for its alleged retaliatory conduct was pretextual. As discussed above, once a plaintiff successfully alleges a prima facie case of retaliation, and once the employer articulates a legitimate, non-discriminatory reason for the challenged employment action, the plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual. Sullivan, 170 F.3d at 1059.

The question the factfinder must answer is whether the employer's proffered reasons were "a coverup for a . . . discriminatory purpose." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002) (we are "not in the business of adjudging whether employment decisions are prudent or fair"). Thus, after considering all of

the evidence, the court must ascertain whether the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that these reasons were "not what actually motivated its conduct." Silvera, 244 F.3d at 1258. In casting such doubt, the plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find [all of those reasons] unworthy of credence." Id. (quotation omitted).

Here, the defendant offered a legitimate, non-discriminatory reason why it terminated McShane's employment, that is, because she could not get along well with others. Amstutz testified that, approximately one month after McShane began her employment with the defendant, she appeared less friendly; was disturbed by the background process; and objected to signing standard forms. As documented in his February 10, 1999 memorandum, Troyer asserted that McShane had, among other things, become "virtually reclusive," engaged in "recent bizarre behaviors," and might be a danger to herself and others. Moreover, after Hughes met with McShane on February 11, 1999, the defendant continued having problems with McShane.

We have concluded that the "ability to handle reasonably necessary stress

27

and work reasonably well with others are essential functions of any position." See Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002) (discussing whether the plaintiff established a prima facie case of discrimination under the Americans With Disabilities Act ("ADA")). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004). McShane concedes on appeal that she did not get along with others since her first day of work.

To the extent McShane, instead, speculates that the defendant would have terminated her employment immediately upon hire if its reason for the decision was that she could not get along with others, and she cites to the fact that her employment was terminated within three business days of her initiating an E.E.O.C. complaint, "a close temporal proximity between two events may support a finding of a causal connection between those two events." See Wascura v. City of South Miami, 257 F.3d 1238, 1244-45 (11th Cir. 2001). Such a showing, standing alone, however, does not necessarily establish that an employer's articulated reasons for taking adverse actions were pretextual. See id. at 1245 (concluding that pretext in ADA case was not established solely by the three and one-half month period between the plaintiff's notifying her employer of her son's

28

illness and her subsequent termination).

As discussed above, Hughes, the decision-maker, stated that he did not know that McShane made a complaint about discrimination based on her gender. The defendant also initially took steps to deal with McShane's problem with dealing with others, other than terminating her employment, which included installing a lock on her office door. In addition, on February 11, 1999, after Troyer informed Hughes of McShane's complaints, but before McShane allegedly initiated an E.E.O.C. complaint, Hughes conducted a meeting with McShane, Amstutz, Cockshutt, and Troyer, (1) to give McShane the opportunity to express her concerns, and (2) to determine if appropriate actions were needed and could be taken. When it became clear that there was no way to resolve McShane's concerns, Hughes, Amstutz, and Cockshutt came to the agreement that McShane's employment with the defendant should be terminated before the completion of her probationary period. Thus, although McShane's alleged protected activity and the termination of her employment were only separated by three business days, McShane has simply failed to produce evidence of pretext.[18]

_____

[18] As the defendant asserts, under the mixed-motive defense, an employer may avoid liability in a Title VII retaliation case if it would have made the same disputed employment decision in the absence of the alleged bias. See Pennington v. City of Huntsville, 261 F.3d 1262, 1269 (11th Cir. 2001). Nevertheless, because McShane has failed to show that the defendant's legitimate, non-discriminatory reason for his termination was pretextual, we need not determine whether this defense was applicable in this case.

Accordingly, we conclude that the district court did not err in granting summary judgment on McShane's Title VII relation claims. We, therefore, affirm.

**AFFIRMED**.